STATE of Missouri, Respondent,

v.

Ralph Junior MARLER, Appellant.

No. 54601.

Supreme Court of Missouri, Division No. 1.

May 11, 1970.

**954**

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Wayne T. Walker, Springfield, Mayte Boylan Hardie, Springfield, for appellant.

HOUSER, Commissioner.

Ralph Junior Marler, convicted by a jury of second degree burglary, found by the court to have been previously convicted, sentenced, imprisoned and discharged, and sentenced by the Circuit Court of Greene County in this case to 4 years in the custody of the department of corrections, has appealed.

Appellant's first point is that the court erred in not directing a verdict of acquittal because all of the State's evidence was circumstantial, and there was a failure to establish appellant's guilt, since the facts and circumstances proven were not irreconcilable with his innocence.

The evidence clearly demonstrated that an IGA Foodliner Store was burglarized at about 2 o'clock a.m. on June 21, 1968.

Witness Capatola Reaves was sitting on her front porch with her husband, at a point perhaps 500 feet north of the rear of the IGA building at that time. The IGA store was one of several business houses in a shopping center, the rear·doors of which faced north. Lights were burning at each of the rear doors of the various occupants. Mrs. Reaves observed several (about five) men running from west to east behind the shopping center. They approached the warehouse doors of the IGA store. She saw them break open these doors and heard a noise which sounded like a gun "when the door popped open." A minute or so later she saw two more men run along the back of the building, coming from the same direction. These two broke out a light above the door, went inside and closed the doors behind them. Mrs. Reaves called the police. Two officers arrived a minute or two later. When the police arrived Mrs. Reaves saw several men (six or seven) running out the back door of the IGA store, with the police chasing them. All of the men ran north, in the same direction. Two of the men were caught by the police at the southeast corner of a building located on the Frisco shop yards which lie north of the parking area on the north side of the shopping center. Mrs. Reaves did not know whether the two men who were caught were the persons whom she had seen run out of the door of the grocery store, because she could not follow them with her eyes "all the way" on account of "an embankment there." The terrain is such that approximately 400 feet south of Mrs. Reaves' house the land drops off eight or ten feet,

and then comes back up to the parking lot behind the shopping center. The embankment does not obstruct one's view of the back doors of the shopping center stores (there is a "clear view") because the top of the embankment is on the same level as the store, but a person who is down in the "draw" cannot be seen from Mrs. Reaves' porch. Because of darkness Mrs. Reaves did not recognize physically either the policemen or the men who came out of the grocery store. She could not describe their facial features and could not identify them individually. She did not know what they used to open the door. She saw no tools in any person's hand, or whether their hands or faces were covered, and did not see anyone take anything into the building.

Officer Woods stopped his patrol car at the northwest corner of the shopping center, got out and as he came around the end of the building he saw several subjects run north from the vicinity of the back door of the IGA market north across the pavement and down across the railroad tracks. He and his fellow Officer Steib pursued them. After Woods had taken a few steps, and just as the first group was leaving the pavement, he observed three or four other subjects "come from the rear of the store" —"come out" of the store—running north probably 10 steps behind the first group. Officer Woods "saw [this one man—appellant] come out of the door and [he] followed him until he caught [him]." The two officers overtook and captured two of the last group after running 50 to 75 yards. When apprehended the two were about 20 feet apart. One of the two, this appellant, fell to the ground when he was caught. Officer Woods noticed that appellant had on a pair of gloves "which was unusual, as warm as it was" (in the 80's). While on the ground he removed the gloves and tried to hide them in the grass.

Officer Steib did not see the second group of three or more subjects actually come out of the door of the IGA store. He first saw them when they started running out from behind an incinerator located on the north wall of the IGA store 10 feet west of the door. He testified "That's about where they was when they came out" (referring to their position behind incinerator). In general he confirmed the testimony of Officer Woods, including the fact that appellant was wearing gloves when captured but was no longer wearing gloves when he got up out of the grass.

Appellant testified that he was attending a drinking party at a house located a short distance north and west of the shopping center on the night in question; that everyone at the party ran out of cigarettes sometime between 1 and 2 o'clock a.m.; that he left the house to get cigarettes at the laundromat located in the shopping center, which is open all night; that as he was returning to the party, and after he had walked across the last set of railroad tracks north of the rear of the shopping center, he heard "a bunch of hollering" and saw people running all around the rear of the IGA store; that he had previously been convicted and knew that if he got caught in that area "they'd pick [him] up," so he started to run north at a point two or three hundred feet north of the IGA store. He denied any participation in the burglary of the store; denied that he owned the gloves referred to by the officers, and denied any connection with the tools and implements found by the officers at the scene of the crime.

Appellant places his principal reliance upon the rule that when the evidence of an accused's agency in connection with the crime charged is entirely circumstantial the circumstances must not only be consistent with each other and with the guilt of the accused but also they must be inconsistent with any reasonable hypothesis of his innocence. He claims that there is no evidence that he entered or left the store; that Officer Woods testified only that he came from the rear of the store and Officer Steib testified that he came from behind the incinerator; that the only circumstantial connection with the crime was the fact

that he was caught running in the vicinity near the time of the crime and that a pair of gloves never connected with the crime were found near where he had lain on the grass; that the officers' testimony about the gloves was conflicting and impeached; that flight, of itself, is not prima facie evidence of guilt and is insufficient to support a conviction, and that while the State's evidence was sufficient to show that a crime had been committed and to raise suspicions as to appellant's complicity, it was clearly insufficient to establish a set of circumstances inconsistent with his innocence.

Appellant's claim that he was entitled to a directed verdict of acquittal is based upon the invalid premise that the evidence of his connection with the crime is entirely circumstantial. He does not question the sufficiency of the evidence to establish that there was an unlawful breaking and entering but boldly and erroneously states that " * * * no witness testified that he had seen the appellant leave the store."

Store employees testified that the store was locked up the night before. Mrs. Reaves' eyewitness testimony showed that in the early hours of the next morning approximately seven men broke into and entered the store. Police Officer Woods gave direct eyewitness testimony that appellant was one of a group of three or four men he saw come running out of the rear of the store (out of the door) and that he immediately pursued and apprehended him in flight. Officer Steib's testimony was closely corroborative. Police officers, store employees and photographs established that the IGA rear door had been forced open and the bolts broken, and that the store safe had been placed on a dolly and moved from its regular location toward the rear door, thus clearly indicating that the illegal entry was for the purpose of stealing. Mrs. Reaves saw the men exit from the rear door and witnessed their flight and the capture of this appellant. This evidence clearly shows that insofar as the criminal agency of appellant is concerned this case was not based upon circumstantial evidence but upon direct eyewitness testimony. Appellant's connection with this burglary was further borne out by the circumstance of flight and the evidence as to the gloves, which takes on significance in view of the fact that it was a very warm night, coupled with the further fact that the tools found at the scene of the crime, dusted, revealed no fingerprints. "The gloves would prevent the imprint of the fingers of those participating in the burglary * * *." State v. Russell, Mo.Sup., 324 S.W.2d 727, 731. A submissible case was made by the State and there was no error in not directing a verdict of acquittal.

◼◼ Admission in evidence of State's Exhibits 10, 12, and 13 is assigned as error on the ground that they were not shown to have been in appellant's possession at any time or to have been used in the commission of the burglary. Exhibit 10 was a lug wrench; 12 was a large screw driver and 13 was a crowbar. The crowbar and wrench were found inside the store, lying on a cardboard box near the store safe. The store manager had never before seen them. The screw driver was found just outside the back doors on the pavement. The front door of the store had been "jimmied" and the door jamb sprung by insertion of some sort of tool. The rear doors had been forced by the use of some sort of tool. The exhibits are such as are generally known to be the common tools of burglars and thieves. "Where the evidence shows that accused was in the vicinity of the scene of a burglary * * * about the time of its commission, evidence that he was in possession of or had access to burglarious tools with which the crime was or might have been committed is competent, if under the particular facts of the case the tools * * * are sufficiently connected with accused and the crime to become relevant and have some probative value and if they bear on the question of intent." State v. Miller, Mo.Sup., 368 S.W.2d 353, 360 [14]. Although these ex-

hibits were not shown to have been the property of appellant and it was not shown by direct eyewitness testimony that they were actually in his possession, the jury reasonably could infer under the circumstances that these exhibits had been in the possession of appellant and his companions when they entered the store, and that they had been used in the commission of the burglary. A case in point is State v. Lindner, Mo.Sup., 282 S.W.2d 547, 551 [6], in which crowbars foreign to the establishment, found in the burglarized premises under analogous circumstances, were held properly admitted in evidence.

■ Error is charged in not taking sufficient steps to cure the admission of testimony that appellant had committed a juvenile offense. Appellant testified in his own behalf, and the State's attorney cross-examined him about his past criminal record. Among other things appellant was asked whether he had not spent six months in the jail at Ava for assault and battery. This he denied. Asked if he had been there "for a crime" appellant answered "I was a juvenile at the time. I was sixteen, I believe it was." Asked if he was given six months in the Ava jail for felonious assault and fined $100, appellant denied it. Pressed as to the date December 13, 1948, appellant's counsel interrupted to ask appellant's age. Appellant answered that he was thirty-six, whereupon appellant's counsel stated, "If the Court please, I think we are getting into a pretty dangerous area here." Proceedings ensued outside the hearing of the jury, in which the court inspected appellant's prison record. The jury was brought back into the courtroom, and the court instructed the jury to "disregard the last question and answer thereto by the prosecutor concerning an assault or an alleged assault that would have occurred or did occur at the time the defendant was a juvenile. He could not be charged as an adult with that crime."

From this indefinite record it is difficult to determine whether appellant had been tried as a juvenile and adjudicated a juvenile delinquent. Assuming that he was so adjudicated, we find no reversible error in this situation. In the first place, there was no proper objection. The suggestion of counsel that a "dangerous area" had been entered was insufficient to raise the point. We will nevertheless treat the suggestion of counsel as an objection, as the trial court apparently did. It then was incumbent on the trial court to take remedial action, because it is an error to impeach a defendant in a criminal case by referring to the fact that he was adjudicated a juvenile delinquent. § 211.271, RSMo 1959, V.A.M.S. The error, however, was not so disruptive of the trial as to require the court on its own initiative to discharge the jury. This is especially true in this case, in which appellant had already been seriously impeached by his admissions that he had been convicted and had served time in the penitentiary on a bad check charge, and that he had previously been convicted of grand larceny. The court, recognizing that some action was required, instructed the jury to disregard the question and answer, thus in effect sustaining counsel's "objection." Appellant made no further effort to capitalize on the error. There was no request for further corrective action; no request that the question and answer be stricken from the record, or that counsel for the state be reprimanded, or that the jury be discharged and a mistrial declared. Under the circumstances the error was sufficiently cured by the action taken by the court.

No reversible error appearing, the judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and ADAMS, Special Judge, concur.

BARDGETT, J., not participating because not a member of the court when case was submitted.