STATE of Missouri, Respondent,

v.

Michael HEITMAN, Appellant.

No. 55595.

Supreme Court of Missouri,
Division No. 1.

Dec. 13, 1971.

John C. Danforth, Atty. Gen., Glen A. Glass, Asst. Atty. Gen., Jefferson City, for respondent.

John B. Mitchell, St. Joseph, for appellant.

HOUSER, Commissioner.

Michael Heitman, convicted by a jury of burglary second degree and sentenced to 3 years' imprisonment, has appealed.

Appellant's first point: the court should have directed an acquittal for insufficiency of evidence. The jury could have found these facts: The building superintendent of the Masonic Temple at St. Joseph, George Jackson, left the building at 11 p. m. after locking his desk, shutting, locking and securing two safes, and securing four entrances to the temple. At 3:15 the next morning Alvin Balchen, who lived in an apartment across the street from and overlooking the temple, was awakened by a noise. He looked out his window, "saw a great deal of commotion" and observed four males. Two lights on the temple and a street light in the alley revealed two men in front of the building and two in the alley. He could not see their faces; he did not recognize any of them. The men were of average height. One was rather heavy and somewhat shorter than the others. One of the men was kicking at the front door. Jackson saw no one enter or leave the temple but he saw the four men leave the vicinity, running away from the building toward the east and out of his vision. Shortly afterwards ("a few minutes" later) he heard an automobile start; the "putt-putt" sound was "sick." A sporty car drove westward on Robidoux, the street which ran between Balchen's apartment and the temple, making the same "putt-putt" sound. The car had a dark-colored bottom and a light-colored canvas-type top. It turned north off Robidoux. Balchen called the police about 3:20 a. m. Police officers were dispatched to the temple, where they found the tell-tale marks of burglarious entry, breaking open of safes, rooms, lockers and desks.

At 3:37 a. m. Detective Brown, working in a squad car with Detective Wise, received a radio communication, proceeded to the temple, found that the south door had been pried open, found the lock on the floor inside the building, saw the open vault door of the walk-in safe, the combination knocked off and on the floor, and observed a hole through the safe wall. Brick, cement, mortar and debris were scattered in front of the door, around the safe "and all around the outside" of the vault.

Officer Linder, in the vicinity of 8th and Olive Streets, received a radio communication concerning the temple incident at 3:37 a. m. and was given a description of the automobile as a Ford convertible with a white top and a dark bottom. At 3:39 a. m., on his way to the temple, he saw a 1960 Ford convertible, white top and dark bottom, proceeding east on Charles Street.

Linder recognized the car and knew that the owner of the car was Roger Miller. The police car and Ford met and passed at 7th and Charles. Officer Linder turned around, headed back east, pursued the Ford, and turned on red lights. His primary purpose was to check to make sure that Roger Miller (whose driver's license had been suspended, to the knowledge of the officer) was not driving. Another reason for following the car was the fact that the description of the car had been broadcast in connection with the incident at the temple "and the car matched that description." The Ford stopped. Defendant Heitman was behind the wheel. He had been driving. There were four males in the Ford. Officer Boyd pulled up behind Linder's car. As Linder walked up along the right-hand side of the Ford one of the occupants in the back seat tried to hide some objects on the floor between the front and back seats—tried to push them up underneath the front seat. The officer shined his light in the Ford and saw an assortment of screwdrivers, chisels, punches, crowbars and a sledge hammer on the floor. Linder recognized all four of the men. Roger Miller, owner of the Ford, was in the right front seat. Dykes and Clark were in the rear seat. The men alighted from the Ford when asked by Linder to get out. The clothing of all four men was dirty and had "something of a white nature on them"—something which looked a little unusual. It was white in color and had the appearance of concrete or cement substance. Defendant Heitman's clothing was of the same general appearance as that of the other individuals, "slightly messed" and "having a small amount of this substance on his clothing and on his shoes." The four individuals were placed under arrest after the officer looked into the car and before they were asked to get out. After the arrest the vehicle was searched, revealing two chisels, two punches, a tire tool and a large crowbar with a red handle, a small crowbar, four screwdrivers and the sledge hammer,

all lying in plain view on the floor between the front and back seats. A flashlight was in the glove compartment and three sets of gloves were lying on the front seat, in the middle of the seat to the right of the driver Heitman. An opened package of Kool cigarettes was in the glove compartment. A magnetic flashlight was up over the sun visor on the driver's side.

At 4 a. m. the police called Superintendent Jackson at his home. Jackson went to the temple and there examined his desk in which he had left an opened package of Kool cigarettes and a flashlight. The desk had been pried open. The cigarettes and flashlight were missing. The lock on the south exit door of the building was broken and torn out of the door. There were pry marks on it. A wood panel in the rear exit door was broken open but an iron bar across the inside prevented opening the door. One of the north doors bore pry marks. Another north door at the top of a fire escape was "splintered somewhat from being pried on." Jackson saw that the door on the first floor vault was open. The safe combination had been knocked off onto the floor. Six inches to the left of the walk-in vault a hole 15 by 24 inches had been cut through the brick wall into the vault. There was dust on the safe door and "a lot of dust" inside the vault on the floor and wall. There was dust on the floor outside the vault. The combination on the safe on the second floor had been knocked off and lay on the floor, and the locks on several doors to locker rooms on the second floor had been pried open or pried off.

Police officers took a number of interior photographs, looked for fingerprints, packaged the combination knobs and a piece of timber bearing pry marks, and took samples of brick particles, cement dust and mortar. They found fingerprint smudges or smears and what appeared to be glove prints on the safes and along the first floor windows. No clear fingerprints were found.

Sometime between 8 and 8:30 a. m. appellant was interviewed by Chief of Detectives Johnson. At that time appellant had some dust on his clothing and on his shoes. It was gray-white in color and resembled cement dust. The other three men had cement dust on their clothing. A sweater worn by Dykes was taken from him. On the front of Dykes' sweater very small chips of brick or mortar, similar to particles of brick and mortar taken from the vault, were found. All of the articles found in the search were tagged, kept, and introduced in evidence over objection. In addition, samples of cement and brick chips from floor inside and outside the downstairs vault, were taken, kept, analyzed at the highway patrol laboratory and introduced in evidence. The laboratory technician testified that a comparison of the paint on the larger crowbar and the paint on the safe dial revealed a red layer painted over a layer of paint on both of the same type of paint. The smaller crowbar revealed two colors of gray paint which definitely could have come from a piece of wood with pry marks on it taken from a door casing at the temple.

The building superintendent customarily opened cigarette packages in a particular manner, with a pen knife, being careful not to cut the tab loose, not removing any of the cellophane or tinfoil. He had smoked two or three cigarettes from the package which was missing from his desk. The package of Kools found in the glove compartment had been opened in this manner, and two or three cigarettes were missing. The building superintendent identified that package and the flashlight found on the car seat as his property.

None of the four men testified at the trial and there was no evidence of any statements having been made to the police by them.

In this circumstantial evidence case the evidence, in order to be sufficient to support a conviction of second degree burgla-ry, must demonstrate facts and circumstances consistent with each other, consistent with the guilt of appellant, and inconsistent with any reasonable theory of his innocence. State v. Craig, Mo.Sup., 406 S.W.2d 618, 621.

We find the evidence sufficient to meet these requirements. In the dead of the night, when little if any vehicular traffic is abroad on the city streets, four males are seen running east from the vicinity of a burglarized building from which certain distinctive articles have been stolen. Shortly thereafter an automobile motor is heard to start and a distinctive automobile is seen coming from the east, headed west. A witness notifies police of the movements of the four men and of the automobile. The incident and a description of the car is broadcast over police radio. Police observe an automobile of that description, an automobile known to the police as one owned by a person whose driver's license has been suspended. Police stop the automobile a matter of minutes in time and seven blocks in distance from the time and place of the burglary. Four males are found in the automobile, including appellant, who is driving the automobile. Numerous burglar tools are in plain view on the floor of the car. As the police approach the automobile one of the occupants in the back seat tries to hide the tools under the front seat. The police flash a light into the interior of the car, see the burglar tools, arrest the occupants and search the car, finding in addition to the burglar tools three pairs of gloves, and finding in the glove compartment the distinctive articles stolen from the burglarized building. These articles are identified by the owner as having been left in a desk in the building, which was found pried open. Cement dust is found on the clothing of all four of the men and on appellant's shoes. Laboratory tests indicate that mortar found on the sweater of one of the men is similar to that of the vault and in the vault room in the burglarized building, debris created in

the course of forcibly breaking out a large hole in a thick brick wall.

Citing State v. Watson, Mo.Sup., 350 S.W.2d 763, State v. Murphy, 356 Mo. 110, 201 S.W.2d 280, and State v. Allen, Mo.Sup., 420 S.W.2d 330, appellant argues that there is no evidence that he was at the scene of the burglary; no evidence that the articles taken from the automobile were in his possession or were connected with him in any way; no evidence of a conspiracy between him and any one or more of the other three persons arrested, and that the mere presence of appellant in the automobile or his mere presence seven blocks from the scene of the burglary is not sufficient to justify his conviction of burglary second degree. Although appellant was not identified by witness Balchen as one of the four males fleeing from the vicinity of the temple, and there was no direct evidence of his participation in the burglary, the circumstances allow the inference that appellant burglarized the temple. It is inferrible that the four fleeing males were the ones who committed the burglary and that the 1960 Ford convertible was the "getaway" car used by the burglars. Having been found driving the getaway car in which four males, numerous burglar tools and distinctive articles identified by their owner and thus exposed as the fruits of the crime were found, appellant is directly connected with the burglary. A defendant's possession of property stolen in a burglary is evidence of guilt connecting him with the commission of the burglary and in the absence of countervailing evidence is sufficient to sustain a conviction of burglary. The possession must be recent, personal, exclusive, distinct and conscious, and unexplained. State v. Watson, supra. That the possession was recent and unexplained is patent. Whether appellant's possession of the cigarettes and flashlight was personal, exclusive, distinct and conscious is challenged. The requirement of exclusivity does not necessarily mean possession separate from all others.

"The possession of recently stolen property which will support an inference of guilt may be a joint possession of the accused and others and such possession need not be separated from all possession by others." State v. Cobb, Mo.Sup. en banc, 444 S.W.2d 408, 412 [5]. Under State v. Cobb joint possession of property or burglary tools by two or more persons acting in concert, supplemented with other facts connecting them with the crime, is sufficient to support the inference of guilt. There is a justifiable inference that appellant was at the scene of the crime with three other men. Burglar tools and articles which it may be inferred were used and taken in the burglary were found in an automobile driven by appellant and occupied by four men traveling together. The four were apprehended near the scene of and shortly after the burglary. When apprehended all four men wore clothing on which cement and mortar dust was found, dust which it may be inferred was raised in the process of breaking the hole into the vault. The dust, similar to the dust found at the site of the crime, found on the clothing of each of the four, is the common denominator which, together with the other incriminating circumstances, permits the inference that all four acted knowingly together in the joint and common enterprise of burglarizing the temple and breaking through the safe wall, and implicates all four in the rifling of the desk from which the cigarettes and flashlight were missing and the act of placing the flashlight on the car seat and the cigarettes in the glove compartment. We need not dwell on the nice distinctions between the character of appellant's possession of these articles as contrasted with the possession attributable to the other three occupants of the convertible. One or more of the four obviously was in the personal, distinct and conscious possession of recently stolen goods and in view of the evidence of joint commission of the burglary it is immaterial which one had possession. The possession of one was the possession of all and the knowledge of one was the knowl-

edge of all, in the eyes of the law, under the circumstances of this case of joint possession.

State v. Watson, supra, cited by appellant, was repudiated on this point in State v. Cobb, supra, 444 S.W.2d l. c. 414 [6]. The facts in State v. Murphy, supra, were quite different from the instant facts and rose no higher than to point the finger of suspicion at Murphy. In State v. Allen, supra, the supplemental other facts in the evidence supporting a conviction were defendant's incriminating fingerprints.

A submissible circumstantial evidence case was made and the court did not err in overruling the motion for acquittal.

■ Appellant makes the point that the court erred in admitting Dykes' sweater in evidence because it shows no involvement of appellant in the burglary, is too "remote" to have any probative value in determining his guilt or innocence and there is no showing that the sweater was in his possession. Appellant argues that there was no showing that the owner of the sweater and appellant were at the scene of the crime, no showing of a conspiracy involving appellant and Dykes and no showing of appellant's actual or constructive possession of the sweater. Given the common participation of four men in the joint commission of a crime, of which we have found substantial circumstantial evidence, any evidence which aids in incriminating any one of the four is admissible in the trial of any one of them. The sweater and incriminating mortar particles it bore were admissible in evidence in appellant's trial because they tend to incriminate Dykes, the owner of the sweater, and through Dykes to incriminate appellant as a common participant in the joint commission of the burglary. While the sweater in and of itself does not show appellant's involvement in the burglary it is evidence of Dykes' involvement, and is admissible in evidence in appellant's trial where there is other evidence that Dykes and appellant were acting in concert.

■ Appellant objects to the introduction in evidence of the burglar tools found in the car because there was no showing that appellant was in possession of the tools. Appellant having been found in the vicinity of the burglary shortly after it was committed driving what the jury could have found was the getaway car, openly carrying numerous burglar tools connected with this crime by laboratory examination of the paint scrapings found on the crowbars, and appellant obviously having access to the tools, the jury could reasonably infer that under the circumstances shown the burglar tools had been in the possession of appellant and his companions when they entered the temple and that they had been used in the commission of the burglary. There was no error in admitting the burglar tools in evidence. State v. Marler, Mo.Sup., 453 S.W.2d 953 [2, 3].

■ Admission of the tools in evidence is further objected to on the ground that the search of the automobile was illegal because the officers had no probable cause to arrest appellant or the other occupants of the automobile, since no traffic violation was committed in their presence. The automobile was the property of Roger Miller. It is not suggested that appellant had any property interest or possessory interest in the automobile. He expressly disclaims possession of the contents. An accused has no standing to raise the question of an illegal search of someone else's property. The limitations imposed by the constitutions upon search and seizure apply only to the owner of property or to one in possession thereof. State v. Booker, Mo. Sup., 454 S.W.2d 927, 929 [1, 2].

■ Admission of the cigarettes and flashlight in evidence is protested on the ground that there is no showing that appellant was in possession of that property,

and error is assigned in overruling appellant's motion to suppress evidence. These points have been abandoned, not having been carried forward in the argument portion of appellant's brief. Criminal Rule 28.02, V.A.M.R.; State v. Sykes, Mo.Sup., 436 S.W.2d 32 [1].

■ Appellant has raised and briefed the question of the sufficiency of Instruction No. 6, which is assailed on the ground that (1) it fails to define the crime of burglary in the second degree, and (2) it assumes facts not in evidence or existence, namely, that appellant was at the scene of the alleged crime and knowingly acted in concert with other persons with a common intent to commit the offense of second degree burglary. The instruction in plain and unmistakable language authorized a verdict of guilt upon the finding of the necessary facts constituting burglary in the second degree. No request was made for an instruction defining "burglary in the second degree." If appellant desired such an instruction he should have asked for it, and in the absence of such a request there was no error in failing to define the term. State v. Hammond, Mo.Sup., 447 S.W.2d 253; 9A Mo.Dig. Criminal Law Key No. 824 [2]. We have read the instruction carefully and do not find it subject to the criticism that it assumes facts. On the contrary, it requires the jury to find beyond a reasonable doubt each of the several facts hypothesized in the instruction.

Judgment affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The forgoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.