**STATE of Missouri, Plaintiff-Respondent,**

v.

**Walter E. NOLAN, Defendant-Appellant.**

**No. 34627.**

Missouri Court of Appeals,
St. Louis District,
Division Two.

Aug. 28, 1973.

242

Preston E. Roskin, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, Gene McNary, Pros. Atty., Thomas Dittmeier, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

PER CURIAM.

Defendant-appellant, Walter E. Nolan, was convicted of robbery in the first degree by means of a dangerous and deadly weapon and sentenced by a jury to a term of fifteen years in the Department of Corrections. He appeals.

This whole tragic episode occurred on the night of June 19, 1971. The record is extremely lengthy. There are two wholly inconsistent and contradictory versions of the events—the state's and the defendant's. In addition to the adversary proceedings between the state and the defendant, appellant also alleges ineffectiveness of his trial counsel. Present counsel was appointed for the hearing on the appellant's motion for new trial on the grounds of trial counsel's ineffectiveness and was also appointed to handle this appeal.[1]

There are two separate, broad issues to be determined: (1) the substantive issues of whether there was error in the trial, and (2) whether trial counsel was ineffective, thereby denying appellant a fair trial.

The incident giving rise to this proceeding was a robbery at Lee's Liquor Store in

1. On this appeal Mr. Nolan has, with permission, filed his pro se brief and a reply brief. He also alleges ineffectiveness of appellate counsel.

St. Louis County on June 19, 1971. Subsequently thereto, an indictment was returned on July 12, 1971, charging Walter E. Nolan with the offense of robbery in the first degree by means of a dangerous and deadly weapon by robbing, stealing and carrying away $1,147.61 belonging to Frederick (Leeander) Eckstein, doing business as Lee's Liquor Store. A five-day trial began on January 31, 1972.

The state's evidence shows the following. Eckstein, the operator of the liquor store located at Highway 66 and Lindbergh in Sunset Hills, was the victim of the robbery with which appellant is charged. On the night of the robbery there were some cars, a truck and a tractor trailer parked outside the liquor store. There were some hedges nearby. At about 10:30 p. m. on the evening of the robbery Eckstein was in the store alone when a man walked in. Eckstein walked over to him and the man announced "This is a holdup." The man was holding a "small caliber automatic." The man instructed Eckstein to take the bills from the cash register and place them into a paper bag. He placed therein about $100 in "ones and fives." While the proprietor was following these instructions, a customer came into the store; he was later identified as the state's witness, Gary Feldmann. The robber then asked Eckstein for more money, and when Eckstein said he did not have any more, the man said "Yes, you have" and came around the counter and picked up a plastic tray containing silver and paper money. When the man proceeded out the door, Eckstein picked up his own gun (a .38 caliber Smith and Wesson revolver) from under the counter and fired at him "from the door."

Eckstein stated that he was not certain whether the shot had hit him. Eckstein said that he "figured he run [sic] into the hedges." The man came out from behind the hedges and Eckstein fired again; the man fired back and Eckstein received a wound in the abdominal area. Shots were exchanged. Eckstein instructed the man to drop the gun, and when he did not, Eck-

stein fired again and the man fell. When the robber fell, Eckstein went over to him and kicked the gun out of the way; he then handed his gun to a customer standing nearby, telling him to hold it on him so he could look for the money. The "customer" was later referred to as a "big burly man" but was never identified.

Eckstein then went back into the hedges to look for the money but could not find it because it was dark. Later, $1,147.61 was found by the police and a receipt given to Eckstein.

Eckstein made a positive in-court identification of the man who came into the store, pointed the gun and held him up, although he stated that Nolan had gained a lot of weight. Eckstein had seen appellant in the store before, "often enough to remember him."

Eckstein was unable to name the "customer" to whom he had given his weapon after the robber fell; he only knew that the man lived in Valley Park and had heard that the man had subsequently died.

On cross-examination Eckstein was asked " . . . how many times did you shoot this person?" He replied, "Well, the gun was empty, I guess. I shot six times unless it misfired." He admitted that after he received his wound in the abdominal area he probably shot four times. He also stated that he put three bullets into the man, "one in the stomach, neck and elbow," but admitted he did not know how many times the robber was shot.

The state also called Gary Feldmann, the customer who had walked into the liquor store while the holdup was in progress. Feldmann had come into the store to cash a check; while he went into the store, his friend, Diane Frey, remained in his automobile. Feldmann testified that when he walked into the store two people were present. He saw a man with a gun holding a paper sack. Feldmann started to back out but "he stopped me." The man instructed Feldmann to stand beside some

beer cases and an icebox. He saw the robber come around the corner and grab the plastic tray. As he came around Gary's way, the robber shoved him and told him not to move. Feldmann stated that Eckstein pursued the robber and fired a shot close to the door, but was unable to state the exact position of Eckstein at the time he fired the shot. As Eckstein went by he told Feldmann to stay for a minute and to "duck down." A short time later Gary went out to his car and saw both men firing about one car length apart. He testified that Eckstein "kicked the gun away and give [sic] it to some other guy [who] was there." The gun that was kicked away looked like state's exhibit no. 8 (a .32 caliber automatic).

Feldmann identified the appellant as the man who robbed the store. He was "sure" appellant was the man who was in the store and who "took the money from Mr. Eckstein and ran out, then later was in this gun battle."

The state also called Diane Frey, Feldmann's companion. She stated that she saw a man push Feldmann against the beer cases and heard a shot. She could not positively identify Nolan, although she said that when she went over to look at the man who was on the ground (Nolan), he "looked like the same" man as the one in the store because he had the "same dress" and "he had gray white hair." On cross-examination she said she told a police officer that she heard Nolan say " 'I didn't do it, I wasn't the one.' "

Several members of the St. Louis County Police Department were called by the state. Detective Daniel Lee Bradbury received a call concerning the robbery. When he arrived he saw two men bleeding, money on the parking lot, and "a man . . . holding two weapons." Bradbury identified the appellant and Eckstein as the men who were wounded; he also identified the two weapons he took from the unidentified bystander. Bradbury did not get the name of the man, but told him to "stick around" so that he could talk to him later.

When he went to look for him he was gone. Attempts to learn the identity of the bystander were unsuccessful. Bradbury related that he turned the two weapons over to Detective Michael Kurtz of the Identification Bureau.

When Bradbury went over to Nolan while he was lying on the ground, he said he could not get "any coherent statement from him other than cursing." He related that he had Gary and Diane stand over Nolan and asked them if he was the same man they saw in the store. They both said that he was.

Counsel for defendant objected to the introduction of exhibit no. 8 on the ground that there was no proper foundation as to the identity of the bystander, and if in fact he did have the gun. The objection was overruled because the gun was found at the scene. The two guns (state exhibit no. 1, Eckstein's, and state exhibit no. 8) were identified and introduced as the two weapons taken from the bystander.

On cross-examination Bradbury "believed" there was a certain officer who accompanied Nolan to the hospital but did not know his name and his name was not in the police report.

Officer James McPeters of the County Police Department found the plastic tray and the money underneath the wheel of the tractor trailer parked near the store. The tray and money were covered with blood. He turned the tray and contents over to Detective Kurtz.

Detective Michael Kurtz, whose main duty is to assist in the processing of criminal scenes, came to the liquor store. He took the two firearms from Officer Bradbury and identified the weapons he received from Bradbury on the basis of his initials which he had marked thereon. He also seized six .32 caliber shell casings from the ground and received from McPeters the tray containing $921.61. He also took a paper bag containing $126 in "ones and fives" from a coat belonging to

appellant. In one of the pockets of the coat there was a checkbook belonging to appellant. The officer dusted for fingerprints but could not lift any which could be compared with anyone. He also stated he did not receive a large pullover orange shirt and green levis, appellant's clothing.

The coat belonging to Nolan (state's exhibit no. 13) was examined by the chemist of the County Police Department, Robert Roither. He testified that he noted holes "in the back of the neck" and above the breast pocket, and a torn area on the left sleeve in the region of the elbow. Tests were performed on the material surrounding the holes; the tests showed that lead was present surrounding the holes in the neck and breast pocket, but no lead residue was found on the hole near the elbow. Roither concluded that the holes in the neck and chest were caused by bullets, but the one in the elbow was not, although he admitted it was possible that the hole in the elbow had been caused by a bullet even if his experiments had been negative.

The laboratory director and firearms examiner of the police department, Donald Brocksmith, identified state's exhibit no. 8 as a German Mauser .32 caliber semi-automatic pistol. He fired some test rounds from it and testified that the shell casings found at the scene were fired from exhibit no. 8.

Prior to the close of the state's case, the state waived any right to try the defendant under the Habitual Criminal Act, § 556.-280, RSMo 1969, V.A.M.S., and stated that if the defendant took the stand and any prior convictions came out, it would be solely for impeachment.

Counsel for defendant objected again to the introduction of the .32 caliber pistol on the ground that the chain of custody had not been proven. The court, however, felt that since the gun was recovered at the scene by Bradbury, there was no break in the chain of custody so that the gun was sufficiently identified so as to be received.

The theory of defense was wholly inconsistent with that of the state. Five witnesses testified; one of them was Mary Davis, a business associate and acquaintance of the defendant. The defendant also testified. Mary Davis had known the defendant about two and one-half years. She and her sister own a resort on Bull Shoals Lake and Nolan managed the restaurant.

She testified that during the Christmas holidays in 1970 she came home to St. Louis to be with her family. Nolan made the trip with her. She had with her a bag of money, receipts from the restaurant operation, containing approximately $280. The money was in a brown paper sack which was placed in a bank bag which she kept in her bureau drawer in her home. She spent some of the money (about $100) for Christmas expenses. Nolan had access to the bag and knew where the key to the house was. The money was for anything Nolan needed, "for his car or something." When they returned to Bull Shoals she left the money in the bureau drawer.

On June 18, 1971, the day before the robbery, she called Nolan from Bull Shoals. Nolan was staying in Wellston at that time. The conversation was general in nature; she asked about his finances and said "Now, you remember there is money in St. Louis . . . you can get it from the house. I said Walter, you know where the key is. He said 'Yes. I will get it.'" She admitted that she did not know whether Nolan retrieved the bag containing the money. She later learned Nolan had been wounded and visited him in the hospital.

The defendant took the stand in his own defense. He testified that he was 68 years of age; that he went into the resort venture with Mrs. Davis in 1970. In connection with the events on the night of June 19, he went to Mrs. Davis' home, went into the bedroom and took out "this paper bag" and put it in "my left-hand coat pocket." He then drove to a station to obtain gas

and tried to get a package of multifilter cigarettes which "You can't get" in machines. He also was looking for a pay telephone booth because he wanted to call Mary Davis back to tell her, among other things, that he had picked up the money. When he left the gas station he saw a phone booth at the Texaco station just west of Lee's Liquor Store. He tried to phone Mrs. Davis but could not get the call through because the line was busy. He went to the Texaco station and asked if they had cigarettes. The attendant said they did not but that "Lee's Liquor Store would probably have got [sic] them." He drove his car to the liquor store and parked perhaps 15 feet from the door. He had never been in Lee's Liquor Store before. He noticed parked cars and a tractor trailer rig. He got out of the car and "As I started in the door, I saw a man with a gun in his hand and he was reaching up to take a tray, white tray off the counter. When I saw the gun, I stopped. I was probably right at the door at that time and the man turned around with the gun or with the tray . . . As he approached me . . . I don't know, I stepped into the guy and—I stepped into the man and grabbed the tray and said, 'No, you can't . . . .' I was going to keep him from getting out the door . . . [and] I got shot . . . One in the elbow and [one] back here [pointing to the back of his neck]." He remembers going straight out towards Highway 66 and could not stop. He did not see where the robber went, but went back to his car; just as he reached for the door to get in, he saw the robber and he turned and "shot at me and that one hit me in the head and knocked me out. I fell alongside my car."

Nolan could not identify the man but said that he was approximately his weight and size "because when I stepped into him, he didn't have any advantage over me." His impression was that the man had blonde hair. " . . . he didn't wear glasses and he had a scar, . . . on the right side of the face." He lost con-

sciousness; the first thing he recalled was a lot of gunfire. While he was lying on the ground he could see underneath the trailer and he saw a man in black trousers and a white shirt (Eckstein); when he came around the trailer he had "two guns," one in each hand; there was blood all over the front of his shirt. When Eckstein came up to Nolan "he demanded where is the money and I didn't know what he was talking about at first. And, he kept repeating it, where is the money, what did you do with the money." Nolan said " 'You fool, you shot me and the guy got away.' " Eckstein stood and pointed the gun and said " 'If you don't tell me where the money is, I will kill you.' " Nolan said " 'I don't know where your money is.' And, he shot me two more times, once here under the heart and once down in the abdomen." Nolan stated that there was a "large man" standing near the tractor trailer and Eckstein spoke to him. "[H]e told Eckstein you shot the wrong man." Eckstein went into the store and when he returned he had Gary Feldmann with him. He had Gary by the arm and said " 'Aint he the one, aint it him, aint he the one?' " Feldmann answered affirmatively.

When Bradbury came on the scene Nolan told him that " 'You better get in there and get that guy [Eckstein] and put him in jail or the bug house or something, he would kill five or six people if you would let him run loose.' " That was all that was said. According to the appellant, Bradbury "turned around and left," apparently making no comment.

Nolan said he was not mumbling or babbling incoherently; he was trying to get someone to get him a drink of water or a bottle of soda. "I had reached for my pocket because I had a number of quarters. I had got a bunch of change." Finally, a priest (Father Osborne) came up to him and went and "got me some water."

According to Nolan, a police officer, "a very young, nice looking fellow," accompanied Nolan and Eckstein to the hospital.

When appellant arrived at St. Joseph's Hospital, he realized he was a prisoner. He indicated to an officer that he wanted a paraffin test on his right hand which would prove he had not fired a gun. Nolan's shirt and trousers were introduced by the defense. He stated that he was wearing an orange pullover shirt and heavy green slacks that evening. Nolan was later transferred to the County Hospital; again, he stated, he was accompanied by the young officer. When a nurse came in the next morning, he told her not to wash his right hand. The hand was not washed even when Mrs. Davis arrived a few days later.

Nolan denied having any weapon on the night of June 19 and denied firing at Eckstein.

On cross-examination Nolan insisted that the bag and money recovered were his and, as he started in the door, the door was open because "it is permanently open, I think. I don't think it closes." He thought that because he didn't see "no doorstop or anything."

Nolan repeatedly insisted that "I had five holes in me," one each in the head, elbow, neck, chest under the heart and abdomen.

Dr. Julio A. Lopez, a resident of the St. Louis County Hospital, testified in defense. Dr. Lopez was not in charge of the treatment of Nolan and he was not the attending physician. He brought the medical records at the request of defense counsel. Dr. Lopez testified that Nolan was admitted to St. Louis County Hospital at 12:15 a.m. on June 20, 1971; that the injuries showed he had a laceration wound in the scalp, a gunshot entrance wound in the neck (entrance in the left lateral aspect of the neck and exit in the left clavicle area), a gunshot wound in the left chest (entrance below the "costal" margin and exit in the abdominal wall, right upper quadrant). He also had a gunshot wound in the left elbow with no exit. A bullet was removed from the elbow.

Father Robert Osborne also testified for the defense. He was chaplain for the St. Louis County Police Department. When he arrived he saw Nolan and could understand Nolan's words "very clearly." He went into the liquor store and got a tin cup and brought Nolan a drink of water.

Kenneth Ziegler, an investigator for the public defender's office, stated he had been unable to ascertain the identity of or locate the unidentified man who was given the guns on the night of the robbery or the officer who accompanied appellant to the hospital. He was also unable to locate certain medical personnel who treated appellant, including one physician endorsed by the state. He also stated that the paper bag was not a "Kraft" bag as testified to by Eckstein.

At the close of the evidence the court instructed the jury and counsel argued the case.

Defense counsel reviewed the evidence and inconsistencies therein. Near the end of defense counsel's argument the following occurred:

"MR. MILLER [defense counsel]: . . . Then, I put on Mary Davis. Any time a person takes this witness stand, any time they are subject to grueling cross-examination about their prior convictions, about any indiscretions they had in the past.

MR. DITTMEIER [prosecutor]: I'll object that they are subject—

THE COURT: Overruled. Proceed.

MR. MILLER: Now, you didn't hear Mr. Dittmeier do a thing to say to Mary to show she was a liar . . . Then, I put on Mr. Nolan. You heard the grueling examination, almost two hours, by Mr. Dittmeier. Did you ever hear he was convicted?

MR. DITTMEIER: I object to that, being convicted.

THE COURT: Objection overruled.

MR. DITTMEIER: And he knows the reason.

THE COURT: Objection overruled. Proceed.

MR. DITTMEIER: If he wants to argue on those lines, I will argue them.

THE COURT: Sit down and proceed.

MR. MILLER: You didn't hear one thing brought up by Mr. Dittmeier as to any prior convictions.

MR. DITTMEIER: —I object again. He knows better than that.

THE COURT: Objection overruled. Sit down.

MR. MILLER: I don't want to ask for a mistrial and I am not going to. He was subjected to a grueling examination, over two hours worth. At one time, did you hear Mr. Dittmeier bring up anything that would cause him—cause you to disbelieve his testimony, anything at all? He could have kept him on that stand for two days if he wanted to."

After deliberation the jury found the defendant guilty of robbery in the first degree by means of a dangerous and deadly weapon and assessed his punishment at fifteen years.

A motion for new trial was made both by counsel for the defendant and by Nolan. Counsel's motion urged a new trial. Paragraph 9 of the motion urged a new trial on the ground of the " . . . improper and outrageous conduct . . . and prejudicial comments . . . of State's counsel

through his closing argument, . . ." The motion for new trial complained that the defendant was deprived of a fair trial because the state's counsel not only verbally objected to the defense counsel's statement that "nothing has been brought out by the State as to prior conviction," but yelled "You know this is not true" and threw all his papers down in the courtroom in front of the jury.

Defense counsel was directed to stay in the case to handle the motion for new trial and was also directed to file a motion for new trial on behalf of the appellant on the grounds of ineffective assistance of counsel.

After the motions for new trial were filed, a hearing was held on April 7, 1972, relating to the alleged misconduct of the prosecuting attorney, as set forth in paragraph 9 of the motion, and the ineffectiveness of counsel.[2]

Since Mr. Nolan believed that Mr. Miller furnished him an inadequate defense, the court made a record and permitted Nolan to "handle this entire thing right now and put what you want in the record."

At the hearing on the motion for new trial, defense counsel Miller argued that Mr. Dittmeier, the prosecutor, "interjected plain and reversible error in the closing argument." The court corroborated the fact that there was no evidence before the jury " . . . as to any prior conviction of any kind, even though Mr. Nolan took the witness stand. That is correct."

At the hearing on the motion the court reconstructed the scene during defense

---

2. Nolan's motion alleged that counsel was ineffective in assistance for the following reasons:
1. Inadequately prepared defendant's case for trial, among other things, by:
a. refusing to take the deposition of every person endorsed by the state;
b. refusing to locate witnesses vital to the defense, including the "real robber," the name of the man who handed guns to Bradbury, the name of the nurse at the county hospital and the officer who escorted the defendant to the hospital.

2. Ineffective in his handling and presenting the case by:
a. failing to adequately cross-examine state's witnesses;
b. failing to establish number of bullet wounds;
c. failing to introduce hospital records.
3. That Miller " . . . refused to request a mistrial during the closing argument, against my wishes, . . ."

counsel's argument. Defense counsel said " 'Did you ever hear he was convicted?' At that time, Mr. Dittmeier jumped up, slammed his file on the table and said, 'I object to that being convicted.' I said 'Objection overruled,' very firmly. Mr. Dittmeier then said in a stage [w]hisper, 'And he knows the reason,' and I said, 'Objection overruled. Proceed.' I said it very, very firmly. And then, you repeated —Mr. Dittmeier said, 'If he wants to argue on those lines, I will argue them.' This was all rather loud. There is no question about that. I emphatically said sit down and proceed.

" . . . Then, you [defense counsel] said, you didn't hear one thing brought up by Mr. Dittmeier as to any prior conviction. Mr. Dittmeier said, 'I object again. He knows better than that.' And, at that point, I yelled at him, 'Objection overruled, sit down.' " Defense counsel stated "I believe that is a pretty clear view of what occurred. However, there was some conversation that was missed and very humanly missed by [the court reporter]." The court said, "Mr. Nolan was seated at the counsel table, which is considerably closer to the jury than to the Bench. I distinctly heard Mr. Nolan, during the commotion say, 'Ask for a mistrial.' Mr. Miller said —And, I do not remember whether you used the word Walter or not. I think you only said, 'I do not want a mistrial, we are going to win this case,' and proceeded. Now, that is my recollection of what occurred."

Nolan's motion for new trial on the ground of incompetency was overruled after an evidentiary hearing. The court stated, "Well Mr. Nolan, I am satisfied you had extremely competent counsel and a good trial. Mr. Miller worked hard on your behalf. On occasions, Mr. Miller almost was about to get the Court a little mad at him for arguing your case so

strongly . . . I am going to overrule the motion . . . "

The defendant was sentenced to fifteen years in the custody of the Department of Corrections with credit for jail time.

As stated, two briefs were filed by the appellant, one by his appellate counsel and two, with permission, by the defendant. While all briefs raise the same major grounds for relief, we have considered all briefs filed.

Appellate counsel's brief urges that the judgment of conviction be reversed outright or that the case be remanded for a new trial. Appellant raises four grounds for relief. He contends that the court erred in (1) failing sua sponte to remedy the injury inflicted upon him when counsel for the state "shouted false allegations . . . by contemptuously throwing his file and papers all over the floor in front of the jury, . . . and continued to kick his papers about the Courtroom . . . where there had been no scintilla of evidence before the jury to even imply a prior arrest or conviction . . . ;" (2) failing to find ineffectiveness of assistance of counsel in that he did not introduce the hospital records, failed to include in the motion for new trial as one of the grounds for ineffectiveness the fact that trial counsel mentioned the lack of prior convictions, and failure to request a mistrial because of the improper conduct of the prosecution; (3) violating the rights of confrontation of witnesses when the court overruled the appellant's objection to the introduction of exhibit no. 8 (the .32 caliber automatic) when the weapon was not identified to be the weapon used by defendant; and (4) overruling the motion for new trial when it was called to the attention of the court that the state solicited false testimony from Dr. Lopez.[3]

We take up these issues in inverse order.

3. Basically, the pro se brief covers the same points. Point I is the same; point II is directed at ineffectiveness of trial counsel in failing to secure the attendance of witnesses vital to the defense; point III is basically the same as point III in counsel's brief; and point IV urges error when the court learned that the prosecution had knowingly used a lie and solicited false testimony from Dr. Lopez.

This is a jury tried case. We note at the outset that in a case such as this, when there are diametrically opposed theories and facts and conflicts exist in the evidence, the matter is one for the jury to determine. State v. Ulrich, 316 S.W.2d 537, 538 (Mo.1958); State v. Rose, 325 S.W.2d 485, 487 (Mo.1959). In reviewing a jury verdict in a criminal trial we neither undertake to determine the credibility of the witnesses nor weigh the evidence. State v. Small, 423 S.W.2d 750, 751 (Mo. 1968).

1. The appellant contends that the trial court deprived him of a fair trial when the state knowingly solicited or used false testimony of Dr. Lopez in that he testified there were three gunshot wounds and one bullet extracted from defendant, whereas the hospital records would show that appellant was shot five times and two bullets were extracted. In substance, appellant contends the state suppressed evidence beneficial to the defense and contends that the court, defense counsel and the prosecutor "were made aware of the fact that [the prosecutor] had solicited false and perjured testimony, from Dr. Lopez."

We have examined the hospital records and cannot say that they sustain appellant's position that he had been hit by five bullets or that two bullets were extracted. In several places the records indicate "multiple Gun shot Wounds to neck, elbow and left lower chest," or "Gun shot Wound Left Elbow, Gun Shot Wound of the Neck, Gun Shot Wound of the Chest." The report states that there were entrance and exit wounds—"abdomen—entrance— . . . exit—ant. . . . abd. wall . . . neck—entrance [and] . . . exit . . . ." The record shows that a bullet entered the elbow and there was no exit of the bullet. The x-ray report shows a bullet "lodged in the anterior aspect of the capitulum of the humerus." The hospital records do not indicate that Dr. Lopez testified falsely. Dr. Lopez testified that one

bullet entered the left lateral area of the neck and exited through the left clavicle area; another entered through the left chest and exited through the abdominal wall; and the third bullet was lodged in the left elbow and was removed.

Appellant also contends that the state used false testimony and knowingly used false evidence to secure a conviction. He relies on Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and other decisions. As stated in Giglio v. United States, 405 U.S. 150, 153–154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), there is no question that " . . . deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice' . . . In Napue v. Illinois, [supra] . . . we said, '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears' . . . Thereafter Brady v. Maryland, 373 U.S. 83, at 87, 83 S.Ct. 1194, at 1197, [10 L.Ed.2d 215,] held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.' . . . We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .' A finding of materiality of the evidence is required under Brady, supra, . . . ." See State v. Ball, 408 S.W.2d 17, 20 (Mo.1966); State v. Thompson, 396 S.W.2d 697, 701 (Mo. banc 1965).

In order to vacate a judgment of conviction on this ground it must be alleged and proved that the state knowingly used false testimony or failed to correct it. State v. Harris, 428 S.W.2d 497, 502–503 (Mo.1968). The contents of the medical records do not show that the testimony of Dr. Lopez is false or that the state knowingly used or failed to correct false testimony or suppressed evidence beneficial to the defense.

2. The appellant contends that his right of confrontation secured by the Sixth and Fourteenth Amendments was violated when the court overruled defense counsel's objection to the introduction of state's exhibit no. 8, the automatic .32 caliber pistol, for the reason that the weapon was taken by Detective Bradbury from an unknown witness who was never identified and it was not shown how the witness obtained possession of the gun. This point impliedly raises sub-issues. The police officer was negligent in suppressing evidence and failing to obtain the name of the person who would have been beneficial to the defense so that defendant was not confronted by him and that there was an inadequate foundation for the introduction of the gun, and that the chain of custody was broken.

The court ruled that there " . . . is no break whatever in the chain of evidence. The guns were recovered at the scene by . . . the detective, immediately upon his arrival at the scene . . . The victim Eckstein stated he kicked the gun away, handed it to the large burly individual. The testimony was that Eckstein kicked the gun away from him and handed his own gun to the large burly individual, that when the detective arrived, the large, burly individual was standing over Mr. Nolan with both guns in his hands. The detective took both guns. In view of the extremely short amount of time that elapsed while Eckstein went back to the construction trailer and back—I feel there is no break whatever in the chain of custody and that the gun has been sufficiently identified to properly be in evidence."

 There is no evidence that the state wilfully suppressed the evidence of the unknown witness upon request under the theory of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and other decisions referred to above. And while the defendant, of course, has the right of confrontation of witnesses under Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L.Ed.2d 923 (1965), there is no requirement that he be confronted by all the witnesses that may have been called by the state, State v. Napolis, 436 S.W.2d 645, 649 (Mo.1969), especially where there is evidence, as in this case, that it was believed that the witness was dead. While it may not have been the most efficient police practice in not obtaining the name of the witness, Bradbury explained that there were other matters to be attended to, and this would at best go to the weight of the evidence.

 There was no error in the admission of the gun. The general rule is that where there is evidence that the accused is in the vicinity of the offense and he was in possession of a weapon, the evidence is competent if the weapon is sufficiently connected with the accused to become relevant and have probative value. Cf. State v. Marler, 453 S.W.2d 953 (Mo.1970). Here there was sufficient evidence by Eckstein and Feldmann for the jury to reasonably connect the gun with the defendant. Identification of a weapon allegedly used in the commission of an offense need not be wholly unqualified in order to make the weapon admissible in evidence. State v. Kern, 447 S.W.2d 571, 575 (Mo.1969).

 The court did not err in holding that there was no break in the chain of custody. To establish a chain of custody the evidence must afford reasonable assurance that the exhibit was the same at trial as it was when first obtained. State v. McCrary, 478 S.W.2d 349, 351 (Mo.1972). It is sufficient if the evidence shows reasonable assurance that it was the same and in the same condition. State v. Baines, 394 S.W.2d 312, 316 (Mo.1965). U.S. cert. den. 384 U.S. 992, 86 S.Ct. 1900, 16 L.Ed. 2d 1008.

 3. The appellant urges that the trial court erred in overruling the motion for new trial filed by Mr. Miller at the request of the appellant, and on the direction of the court that he was represented by ineffective counsel at the trial. The alleged

ineffectiveness of trial counsel urged consists of the following:

a. Counsel failed to establish the number of bullet wounds in the defendant;

b. Counsel failed to introduce the hospital records;

c. Counsel failed to allege in the motion for new trial the mentioning of prior convictions;

d. Counsel failed to request a mistrial during the improper conduct of the prosecutor during the defense counsel's argument.

Additionally, appellant's pro se brief contends counsel was ineffective because he failed to secure the attendance of witnesses vital to the defense, such as the police officer who accompanied appellant to the hospital and who overheard his request for a paraffin test and the doctors who extracted the bullets.

■ Normally the issue of ineffectiveness of counsel is raised on a post conviction motion under Rule 27.26, V.A.M.R.,[4] but on occasion this issue has been raised on direct appeal. State v. Wilkinson, 423 S.W.2d 693 (Mo.1968). State v. Cluck, 451 S.W.2d 103, 106 (Mo.1970).

■ A defendant who has been convicted and who asserts that his attorney has not rendered adequate and effective legal assistance commensurate with constitutional standards has a heavy burden to sustain. State v. Wilkinson, *supra*, 423 S.W.2d at 697. Of necessity, counsel for an accused is vested with broad latitude in the conduct of a defense and he cannot be adjudged to be ineffective by reason of what appears, in retrospect, to be errors of judgment. Trial strategy, even though unsuccessful, is an inadequate basis for attacking the competency of an attorney. State v. Wilkinson, *supra* at 696–697. Whether an accused has been afforded adequate and effective assistance of counsel must be de-

termined from all the facts in the case considered in the light of the situation existing at the time.

Numerous tests have been used to measure whether counsel has furnished inadequate assistance. The most usual is that it must amount to a farce and a mockery of justice, Gaitan v. State, 464 S.W.2d 33, 36 (Mo.1971), or be so woefully inadequate as to shock the conscience, State v. Caffey, 457 S.W.2d 657, 662 (Mo.1970), or be a breach of his legal duty faithfully to represent his client, Holbert v. State, 439 S.W. 2d 507, 509 (Mo.1969). In McQueen v. State, 475 S.W.2d 111, 116 (Mo. banc 1971), Chief Justice Finch stated that an examination of the cases indicates that the courts have sought to ascertain whether there has been such a failure on the part of the attorney " . . . that defendant has not had a fair trial . . . Where, . . . the court has concluded that under the evidence before it the defendant had a fair trial, then he has not been granted another trial . . . This is true even though the evidence may have shown that counsel might have prepared or handled the case differently or done otherwise, . . . "

Under any of the tests that the courts have laid down, and after reading the entire record, it cannot be said that trial counsel was ineffective in the sense of depriving appellant of a fair trial. The allegations of ineffectiveness go to matters of trial strategy, or are not such failure which we conclude deprived defendant of a fair trial and we cannot say that the trial court's finding was clearly erroneous. Walster v. State, 438 S.W.2d 1 (Mo.1969). The trial court found that appellant had competent counsel who worked hard on his behalf and, in effect, held that appellant's contentions concerning ineffectiveness lacked merit. We agree.

■ 4. The appellant's remaining point, that he was deprived of a fair trial because of the alleged misconduct of the

4. State v. Blackwell, 459 S.W.2d 268, 269 (Mo. banc 1970).

prosecuting attorney during the closing argument of defense counsel, is not easily resolved.

The defendant took the witness stand; not one iota of evidence came out that he had been previously convicted and spent a number of years in confinement.

During the course of the defense argument, counsel referred to the fact that the prosecutor had produced no evidence that appellant had previously been convicted. At that time the prosecutor objected and stated that defense counsel "knows the reason," and that he would argue along those lines if defense counsel wanted. The court, in reconstructing the scene, found that the prosecutor jumped up, slammed his file on the table and said, "I object to that, being convicted . . . And he knows the reason."

■ Defense counsel has the right to argue, within the confines of the record, the absence of evidence of the conviction of a defendant when the defendant offers himself as a witness and the state fails to cross-examine him with respect to any prior convictions. The issue then is whether under these circumstances the conduct of the prosecuting attorney, in inferring (appellant's brief states that he "shouted" false allegations which is not shown by the record) that the defendant had previously been convicted, constitutes prejudicial and reversible error.

■ The rule always has been and is that prior convictions of the accused may not be shown by the state unless the defendant puts his character in issue. Evidence of a prior conviction is highly prejudicial when introduced originally by the state. This rule which precludes the state from introducing or referring to prior convictions is based not on logic but policy. It is a part of our fundamental law that "[i]n a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar." People v. Zackowitz, 254 N.Y. 192, 172 N.E. 466, 468

(1930). See also State v. Cook, 282 S.W. 2d 533 (Mo.1955), where the prosecutor informed the jury that the accused had "killed one man already."

Since the defendant took the stand he was subject to cross-examination concerning previous convictions. But no evidence was ever introduced by way of impeachment to show any prior convictions. In such a posture, when the prosecutor made gesticulations and "slammed his file on the table" and inferred by his comments that the appellant had a prior conviction, this strong implication may well have prejudiced the jury. The comments by the prosecuting attorney logically implied that defendant had prior convictions and could reasonably have implanted in the minds of the jurors the fact that he had previously been convicted.

The prosecuting attorney holds a unique position in our adversary system of criminal justice. He is a government official and clothed with the dignity and prestige of office. His power to persuade is great. His conduct and statements are weighted with prestige. It is his duty to assure that those accused of crime are afforded a fair trial consistent with due process of law. A prosecuting official is required to refrain from conduct engendering prejudice and to avoid injecting into the minds of the jury any matter which would prejudice their minds. State v. Selle, 367 S.W.2d 522, 530 (Mo.1963).

We do not hold that every improper comment or inference is prejudicial. We only hold that when no evidence of a conviction is shown in a trial, and the prosecutor makes reference to or comments in such a manner so that a logical inference is that the defendant has been formerly convicted, such reference or implication constitutes such a serious matter that it rises to the level of prejudice.

We realize that there was no objection on the part of defense counsel to the remarks of the prosecutor; nor was a motion for mistrial filed by trial counsel; but

in the posture of the case and in the context of the remarks and conduct of the prosecutor, and the fact that appellant desired and urged a mistrial, we hold that the statements and conduct inferred that defendant had been previously convicted and constitute plain error within Rule 27.20(c), V.A.M.R. We cannot say that the injection of this inference of a prior conviction was harmless. The state urges that the prosecutor's comments were retaliatory. But retaliatory comments do not allow prejudicial comment. See People v. Brophy, 122 Cal.App.2d 638, 265 P.2d 593 (1954).

The judgment of conviction is reversed and the cause remanded for further proceedings.

All the Judges concur.