**STATE of Missouri, Plaintiff–Respondent,**

v.

**Frank Lee SIMPSON, Defendant–Appellant.**

No. 15748.

Missouri Court of Appeals, Southern District, Division One.

Aug. 15, 1989.

Motion for Rehearing or to Transfer to Supreme Court Denied Sept. 6, 1989.

Application to Transfer Denied Nov. 14, 1989.

William L. Webster, Atty. Gen., Christopher M. Kehr, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

L.R. Magee, Hines & Magee, Kansas City, for defendant-appellant.

GREENE, Judge.

Defendant, Frank Simpson, was jury-tried and convicted of the crime of conspiracy to commit first degree murder, § 564.016,[1] and thereafter sentenced to 10 years' imprisonment as punishment for the crime.

On appeal, Simpson asserts the trial court erred (1) in overruling his motion for new trial and submitting the case to the jury because the State had not proved all elements of the crime of conspiracy, (2) in admitting into evidence a tape recording which implicated Simpson in a conspiracy plot, and allowing the jury to peruse a written transcript of that recording while it was played, (3) in instructing the jury concerning its use of the transcript, (4) in not allowing Simpson to submit certain letters to the jury which cast doubt on the credibility of the State's chief witness, and (5) in depriving Simpson of effective assistance of counsel by forcing the case to the jury after a 12–hour day in court. We affirm.

We first address the problems resulting from the filing of a defective information by the State in this case, and by the lack of filing of a proper record on appeal, which could explain some of the defects and contradictions appearing on the face of the information.

■ Neither party seemed to notice, or, if they did, chose to ignore, the procedural mess concerning the information itself, the legal problems created by the inept way it was drawn, as well as the lack of information in the legal file concerning certain aspects of the wording of the information. However, it is our duty under the law to examine the information to see if it is sufficient as a matter of law, whether alleged errors are briefed or not. Rule 30.20.

■ The information in this case was filed on August 1, 1986, and reads as follows:

In the Circuit Court of Vernon County, Missouri, at Kansas City, May Term, 1986.

The Prosecuting Attorney of the County of Jackson, State of Missouri, charges that the defendant, FRANK LEE SIMPSON, in violation of Section 564.-016, RSMo, committed the class B felony of Conspiracy While Acting in Concert With Others, punishable upon conviction under Section 558.011.1(2), RSMo, in that on or about June 8, 1986 in the County of Vernon, State of Missouri, the defendant, FRANK LEE SIMPSON, with the purpose of promoting and facilitating the offense of capital murder agreed with Robert Bolt, Virgil Walker and other persons unknown that one or more of them would for payment of money by Frank Lee Simpson kill Sheriff Leonard 'Buck'

---

1. Unless otherwise indicated, all references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

Hough, Jr., Sheriff of Bates County, Missouri, by murdering the Bates County Sheriff, and that in furtherance of the conspiracy they had two or more meetings concerning the murder and Frank Lee Simpson paid $2,000 for this purpose and agreed to pay $3,000 additional money when the Sheriff was dead and a bonus of $1,000 when he had the Sheriff's Badge and I.D. and the setting up of the Sheriff with illegal drugs, pills, needles, and such to frame the Sheriff with illegal possession of Schedule I and II drugs and to plant drugs on witnesses against the defendant's daughter, Stacey Simpson, who is charged with capital murder in Bates County Circuit Court, all in order to blackmail witnesses and the Sheriff.

> NICHOLAS L. SWISHER
> PROSECUTING ATTORNEY OF THE COUNTY OF VERNON, STATE OF MISSOURI, by
> /s/ Kevin E.J. Regan

Kevin E.J. Regan, Special Prosecuting Attorney, County of Vernon, State of Missouri, being duly sworn, upon oath says that the facts stated in the above information are true, according to his best information, knowledge and belief. Sworn and Subscribed before me this 1st day of August, 1986.

> Circuit Clerk of Vernon Co. Mo.
> /s/ Bernice Dobson

WITNESSES: Sheriff Leonard 'Buck' Hough, Jr.

Bates County, Missouri

Several obvious defects appear on the face of the information, the first being in the opening sentence which reads "In the Circuit Court of Vernon County, Missouri, at Kansas City, May Term, 1986." Vernon County is not at Kansas City, being separated from that metropolis by at least three Missouri counties, which are Bates, Cass, and a part of Jackson County, according to the 1988 Rand McNally Road Atlas. The next sentence starts, "The Prosecuting Attorney of the County of Jackson, State of Missouri, charges...." We are left to ponder why the prosecuting attorney of Jackson County is filing criminal informations in Vernon County, as his jurisdiction is limited by law to prosecuting and defending all civil and criminal actions in his county in which that county or the State is concerned. While he may follow and participate in such case if it is taken out of his county on a change of venue, he has no authority to initiate criminal prosecutions in any county but his own. § 56.060.

The information next states that Simpson, on June 8, 1986, in Vernon County, while acting in concert with others, conspired to promote and facilitate the offense of capital murder. There was no such crime as capital murder on June 8, 1986. The statute formerly defining certain acts as constituting capital murder was § 565.001, which defined capital murder as the unlawful, willful, knowing, deliberate, and premeditated killing of another. L.1977, H.B. No. 90, p. 719, § 1, effective May 26, 1977. It was repealed by L.1983, S.B. No. 276, p. 922, § 1, effective October 1, 1984. There has been no Missouri statute passed since that date which calls any type of homicide capital murder.

Finally, the information is signed by Kevin E.J. Regan, who styles himself as special prosecuting attorney of Vernon County, but there is nothing in the legal file that was filed here as a part of record that indicates that Regan was appointed special prosecutor by the trial court, or, if so, when or for what reason. At oral argument of this case, these defects regarding the information were noted by this court, which directed the attorneys for the parties to file supplemental briefs touching on the issues raised by the defective information. The attorney for the State attached copies of several documents to his supplemental brief which purport to show the authority of Kevin Regan to act as special prosecutor in this cause. Those documents are (1) a motion by the prosecuting attorney of Vernon County, Nicholas L. Swisher, to disqualify himself because he was a potential witness, (2) a court order appointing Regan, who was an assistant prosecuting attorney of Jackson County as special prosecutor, and (3) an entry of appearance by Neal Quitno, the Vernon County prosecutor

who succeeded Swisher. Regan filed the information in question and Quitno tried the case.

█ Since the defendant's attorney did not object to the form of the information prior to, during, or after trial and before the filing of his appellate brief, our examination of the defects noted is limited to a determination of whether those defects were sufficient to deprive the trial court of jurisdiction and whether the trial of the case based on the defective information constituted plain error. *State v. Eastin*, 735 S.W.2d 50, 51 (Mo.App.1987).

█ We first examine the defects contained in the information that deal with the pronouncement that Vernon County is at Kansas City, and that the prosecuting attorney of Jackson County filed the charge. The State, in its supplemental brief, categorizes these obvious errors as "typographical errors." They are not typographical errors, but are errors that obviously occurred because Regan, who was a Jackson County assistant prosecutor, used a Jackson County form to prepare the information and carelessly failed to make the necessary deletions and additions on it to conform to the facts of the case. Obviously, Vernon County is not located in Kansas City, and the information should not have proclaimed such. Also, the information should have recited that Regan, in his capacity as special prosecutor of Vernon County, charged, rather than saying that the prosecuting attorney of Jackson County charged, but did not do so. The question is, did either of these mistakes prejudice Simpson's substantial rights? Rule 23.11. The answer is no.

The information does allege the proper county for venue purposes and it was filed with the circuit clerk of Vernon County, who was the clerk of the court having jurisdiction of the offense. Rule 23.01(a). Since Regan's oath to the information proclaims he is a special prosecutor of Vernon County, and Simpson does not dispute the fact that he was, we fail to see how Simpson was prejudiced by Regan being referred to in the information as the Jackson County prosecutor.

█ More troublesome is the allegation in the information that "FRANK LEE SIMPSON, with the purpose of promoting and facilitating the offense of *capital murder* agreed...." (Emphasis ours.) As previously noted, there was no Missouri criminal offense called capital murder at the time of the filing of the information. Was that fact prejudicial to Simpson's right to be advised of the charges against him? Again, the answer is no.

Simpson was charged with conspiracy, not with some degree of homicide. The information properly tracked all elements of a conspiracy charge, and the proper conspiracy statute, which was § 564.016, was cited in the information, which information was in the form prescribed by MACH–CR 18.04. When the statute defining the elements of capital murder (§ 565.001) was repealed, it was replaced on that same day by a statute (§ 565.020) that defined the offense previously called capital murder as first degree murder. The two statutes are identical in substance in that they both represent the highest level of a Missouri homicide offense, and require a finding of deliberation as an element of the offense, which element is not found in any other statute declaring other types of homicides to be crimes. As stated by our Supreme Court, a "prior conviction of capital murder was undeniably the equivalent of a conviction of first degree murder as presently defined." *State v. Clemmons*, 753 S.W.2d 901, 912 (Mo. banc 1988), cert. denied, —— U.S. ——, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988).

Since the substance of the two crimes is virtually identical, we cannot see how Simpson was prejudiced by the unfortunate reference to "capital murder." Simpson was tried as if the underlying charge were first degree murder, the verdict directing instruction referred to a conspiracy to commit first degree murder, and the jury verdict was "guilty of conspiracy to commit first degree murder."

Simpson did not complain at any stage of the proceeding regarding the reference in the information to capital murder, and did

not designate such reference as one of his grounds for reversal on appeal. We find nothing in the record to indicate that the capital murder reference denied Simpson adequate notice of the charge against him so that he was unable to prepare an adequate defense. *See Franklin v. State*, 655 S.W.2d 561 (Mo.App.1983), for a case where the indictment charged defendant with capital murder and first degree robbery, while both the prosecutor and defense lawyer proceeded to trial as if defendant were charged with first degree murder, and the defendant was found guilty of first degree murder and first degree robbery. The *Franklin* court held, "We have no doubt that movant was advised of, and understood, the nature of the offenses with which he stood charged. We find no violation of due process and no prejudice to the substantial rights of the movant." Id. at 564. We hold that Simpson's rights were not prejudiced by the defects in the information as noted above.

We now address the points relied on in Simpson's appellate brief. Viewed in the light most favorable to uphold the jury's verdict, the evidence adduced at trial was as follows. Frank Simpson's wife had been murdered in September of 1985, and Simpson's daughter, Stacey, was charged with the crime. The Bates County Sheriff, Leonard "Buck" Hough, was involved in the investigation of the homicide, and was to be a witness against Stacey when her case came to trial.[2]

Marvalene Pankey was a friend of Simpson's, and also was a friend of Robert Bolt and his girl friend, Gale Allen. Pankey, Bolt, and Allen all resided in Nevada, Vernon County, Missouri. Simpson resided in Bates County. On June 2, 1986, Bolt was asked by Pankey if he would meet with Simpson and his daughter to talk to them about "certain problems" Simpson had. Bolt and Gale met later that day with Simpson, Stacey, and Marvalene at Bolt's home in Nevada. Simpson told Bolt that Stacey had been charged with the murder of his wife and he wanted Bolt to obtain illegal drugs and plant them on Hough and

witnesses against Stacey to "get his daughter out of the difficulty she was in." Bolt told Simpson he would see what he could find out. The following day Simpson asked Bolt if he knew a prostitute that could be hired to entice Hough into a compromising situation which could be secretly videotaped and used to blackmail Hough. Bolt said he could locate some drugs, but did not know how they could be planted on Sheriff Hough, nor did he know any prostitutes who would set Hough up for blackmail. Simpson then asked Bolt if he knew of any woman who could lure Hough away from the Butler, Missouri area so that she or someone else could kill him. Bolt told Simpson he knew of a man who would kill for a price. Simpson told Bolt to contact the man and to find out what it would cost to either "frame the sheriff up or wipe him out."

After the two men went their separate ways, Bolt, instead of contacting a hired killer, contacted the Bates County Sheriff's Office where he was referred to Deputy Sheriff Ralph Lindsey. Lindsey arranged a meeting for later that day between Bolt, Lindsey, Hough and the prosecuting attorney of Bates County. Bolt told them about his two meetings with Simpson and was told "to keep my ears open." On June 8, Simpson again met with Bolt and asked if he had contacted the hit man, and how much the man would charge "to frame the Sheriff or set him up or just wipe him out." Bolt said the price would be $5,000. Simpson pulled out a roll of bills and counted off and gave Bolt $2,000 in one-hundred dollar bills. Simpson told Bolt that he would pay $3,000 more when the job was done, with an extra $1,000 bonus if the killer got the sheriff's badge and I.D. card. After Simpson left, Bolt took the money to Lindsey. The serial numbers on the bills were recorded and the money was later introduced in evidence at Simpson's trial.

It was then decided by federal agents with the Alcohol, Tobacco and Firearms Bureau that agent Virgil Walker would pose as the hit man who would meet with Bolt and Simpson to discuss the details of

2. Stacey later entered a plea of guilty to the murder charge.

the contract. The two men met with Simpson on June 9th, in a park in Nevada, Vernon County, Missouri. Bolt was equipped with a "body wire" which was a transmitter that enabled the conversation with Simpson to be recorded. Deputy Sheriff Lindsey, unbeknownst to Simpson, listened to the ensuing conversation between Bolt, Simpson, and Walker on a monitor. The conversation was recorded on a reel-to-reel tape (Exhibit 16), and a cassette tape, a copy of the original identified as "a work copy" (Exhibit 14) was listened to by Lindsey and compared with a typed transcript of the recording to verify that it was the conversation he had heard on the monitor. Lindsey testified that it was. Walker testified that the cassette recording was a correct and authentic recording of the conversation between Bolt, Simpson, and Walker on June 9th. Walker also testified that the transcript of the recording had not been altered in any way so as to add or delete words that had not been spoken in the conversation between the three men. In addition, Walker testified that as he and Lindsey listened to the tape, they determined who was talking by name, and that those names, or in the case of Bolt, initials of "CI" (confidential informant) were placed on the typed transcript to identify who said what. The tape was heard by the jury, and the court permitted the jurors to read copies of the transcript while the tape was being played so that they could identify who was talking. Before the jury saw the transcript copies or heard the recording, the trial court instructed them that the transcript was not evidence, but was furnished to them merely to help them follow the recorded conversation.

When the State rested its case, Simpson moved for a judgment of acquittal on the grounds that the State had not proved a conspiracy. The motion was denied. Simpson's evidence consisted of the testimony of two persons, Marvalene Pankey, and Simpson. Most of Marvalene's direct testimony was in relation to Bolt's relationship with Simpson's 14 year-old daughter which we assume was offered for the purpose of affecting Bolt's credibility. The cross-examination of Marvalene elicited responses from her that Simpson had told her (1) "that he wanted to set up witnesses in the trial of his daughter Stacey Simpson," (2) "[t]hat if he went to prison everyone around him would go too," (3) "if Robert (Bolt) pulled everything off all of us were going to have to have an alibi as to where we were ...", and (4) "that would be the perfect alibi to be at a church meeting."

Simpson, in his testimony, admitted meeting with Bolt and later with Bolt and Walker, but denied that he had given any money to Bolt to hire a hit man, or that he had conspired with Bolt and Walker to kill Hough. He admitted that his voice was on the tape recording of his meeting with Bolt and Walker, but explained all of his incriminating statements regarding paying the hit man, plus paying a bonus if "you do the job right, do it good enough and make it stick," as follows:

> The only thing that I was doing was basically going along with them. As long as I did not pay them any money I figured nothing can happen to me. I still am trying to gather up and find out all the evidence that I can on what are these people doing.

The jury obviously did not believe this explanation, and returned a guilty verdict.

Simpson's first two points relied on in his appellate brief are related. The first claims the trial court erred in denying Simpson's motion for new trial filed at the close of all of the evidence. The second claims the trial court erred in giving the verdict directing instruction (No. 5). The heart of Simpson's argument on these two points it that there is testimony in the record, which was not contradicted, that neither Bolt or Walker ever intended to kill Hough and, therefore, there could not have been an agreement on their part that Hough be killed. He alleges that since there was no agreement, there could not have been a conspiracy, because the conspiracy statute, § 564.016, states that a person is guilty of conspiracy with another person or persons to commit an offense, if, with the purpose of promoting or facilitating its commission he agrees with such other person or persons that they, or one or

more of them, will engage in conduct that constitutes such offense. Simpson theorizes that since neither Bolt or Walker ever intended to kill Hough, there was no agreement and the State failed in its burden to prove that there was one.

The same argument is used on the claim of instructional error, since the instruction required a finding that Simpson agreed with Bolt and Walker that one of them would kill Hough, and that Simpson so agreed so as to promote and facilitate the crime of murdering Hough. Simpson asserts that since there was no evidence to support the agreement issue, it was error to submit the instruction.

Both contentions are based on a faulty premise, which is that the crime of conspiracy cannot occur unless two or more coconspirators, who possess the same criminal intent or knowledge, agree to commit the charged offense. In *State v. Hohensee*, 650 S.W.2d 268, 275–276 (Mo.App.1982), this court rejected an argument identical to that raised by Simpson on this point. The court held that the fact that the supposed coconspirators, who were really undercover agents for the police, lacked the criminal intent to commit the crime in question was immaterial, as long as the person charged had the requisite criminal intent. The Eastern District of the Court of Appeals adopted the reasoning of Hohensee in *State v. Mace*, 682 S.W.2d 163, 165–166 (Mo.App.1984). The statement in *State v. Fogle*, 740 S.W.2d 217, 222 (Mo.App.1987), cited by Simpson as authority for his position that the offense of conspiracy is an agreement by two or more persons to commit a crime, citing § 564.016 as authority, is overly broad and at odds with the legislative intent as to the meaning of the language of the statute, which intent is spelled out in the "Comment to 1973 Proposed Code" appearing in 40 V.A.M.S. 426 immediately following § 564.016, which comment, in pertinent part, reads:

> The section also follows the approach of the Model Penal Code and other revisions and proposals by departing from the traditional view that conspiracy is an entirely bilateral or multilateral problem, and instead focuses on each individual's culpability. The conduct of the individual becomes determinative rather than the conduct of a group. Under this formulation, one conspirator cannot escape liability because the only other one was irresponsible or has immunity from prosecution or *secretly does not intend to go through with the plan*, or has been found innocent of conspiracy. (Emphasis added.)

Since the evidence was conclusive that Simpson intended to go through with the plan to murder Hough, as shown by his down payment of $2,000 to the supposed hit man, that was enough and the fact that his false friends did not intend to carry out their end of the bargain, which fact was unknown to Simpson, made no difference. The fact, as urged by Simpson, that some federal courts have different ideas on the subject, based on their interpretation of federal statutes markedly different than § 564.016, is immaterial. Their opinions are not binding on us in decisions involving the interpretation of state statutes in cases where, as here, federal constitutional issues are not raised. Simpson's points one and two have no merit.

■ In his third point relied on, Simpson claims the trial court erred in admitting into evidence State's exhibit 16, which was the tape recording of the conversation between Simpson, Walker, and Bolt. It is Simpson's position that there was no proper foundation laid for the introduction into evidence of the tape recording, since the State did not prove the elements required by law before a sound recording of a conversation may be used in evidence. There is a seven-point test that must be met in order to establish the admissibility of sound recordings. Those seven points are:

(1) A showing that the recording device was capable of taking testimony,

(2) A showing that the operator of the device was competent,

(3) Establishment of the authenticity and correctness of the recording,

(4) A showing that changes, additions or deletions have not been made,

(5) A showing of the manner of the preservation of the recording,

(6) Identification of the speakers, and

(7) A showing that the testimony elicited was voluntarily made without any kind of inducement.

*State v. Spica,* 389 S.W.2d 35, 44 (Mo. 1965), cert. denied, 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966).

The evidence on this point is that Bolt was equipped with a hidden transmitter when he and Walker met with Simpson. The entire conversation between the three men was recorded by Deputy Sheriff Lindsey, who was concealed in a nearby location, listening to the conversation on a monitor as it was received and recorded. Before the original tape recording of the conversation (Exhibit 16) and an accurate authentic copy of the tape (Exhibit 14) were offered in evidence, the State laid a foundation for their introduction through the testimony of Walker and Lindsey.

Walker testified that he prepared and activated the device used to record the conversation; that the device was operational and the tape that recorded the conversation could be replayed later; that he had used the device several hundred times; that the recording was an authentic and accurate recording of the conversation that took place; that he recognized and identified the tape in question as the one used to record the conversation in question; that after listening to the tape he could say that no changes had been made to it so as to alter, add to, or delete any of the conversation that took place; that he recognized and could identify each speaker's voice on the tape; and, that the tape had been in his custody since it had been made. He testified that there were a few inaudible words on the tape, but those words were left blank on the transcript of the recording. He also testified that each speaker on the tape recording was accurately identified on the transcription. Lindsey testified, as well, that the only thing put in the transcription was what was heard on the tape and that no additional language had been added. This testimony satisfied the seven point test set out in *Spica.* The State laid a proper foundation for the introduction into evidence of the taped conversation. The point has no merit.

In his fourth point, Simpson argues an additional claim of error regarding the admission of the tape recording into evidence. He claims that the State had not established a proper chain of custody of the tape after it was made. A showing of the manner of the preservation of the recording is, of course, one of the elements the State is required to prove as a prerequisite to the admission into evidence of a tape recording. *Spica* 389 S.W.2d at 44.

Where the evidence shows "reasonable assurance that the exhibit was the same at trial as it was when first obtained," a sufficient chain of custody is established. *State v. Nolan,* 499 S.W.2d 240, 251 (Mo.App.1973). Walker testified that the tape had been in his custody or under his control from the time it was made until the time of trial and had not been tampered with improperly. While we believe that this testimony satisfied the requirement of *Nolan,* Walker, through his testimony, positively identified Exhibit 16 as the tape made during his conversation with Bolt and Simpson. After listening to it, he identified the recording as an accurate recording of what had been said by the three men at the time of their meeting. Where an exhibit is positively identified by a witness, the claim of the lack of a proper chain of custody becomes moot. *State v. Follins,* 672 S.W.2d 167, 169 (Mo.App. 1984). The point has no merit.

Simpson's fifth point is that it was error to overrule his lawyer's objection to the use of the transcript by the jury as an aid to following the recorded conversation of the three men (Exhibit 16), which recording had been admitted in evidence and listened to by the jury. Simpson challenged the authenticity of the transcript because he claims that it was "corrected" after its initial transcription by A.T.F. personnel, Deputy Sheriff Lindsey, and Agent Walker. The point, as stated, violates the tenets of Rule 84.04(d), in that it does not state "wherein and why" the trial court's action was erroneous. The point does not state

how and where the transcript was "corrected," or how such correction was prejudicial to Simpson. The point has not been preserved for appellate review.

■ In his sixth point of claimed error, Simpson claims the trial court erred in letting the jury look at copies of the transcript while they were listening to the recording because "the court did not instruct the jury as to its use in that the jury was never instructed that the transcript was not evidence." The allegation is at odds with the record. The trial judge had heard the testimony of Walker and Lindsey concerning the preparation of the transcript, which included the testimony of Walker, that the transcription was an accurate and complete transcription of the contents of State's Exhibits 14 and 16 (the tapes), with the exception of a few inaudible words shown as "blanks" on the transcript. Prior to the submission of the transcript to the jury, the judge instructed them as follows:

THE COURT: Ladies and gentlemen, we're going to listen to some of these tapes now. Now these transcripts are going to be given to you to assist while listening to certain tape recordings which are evidence in this case.

However, the transcripts are not evidence or proof of any fact. If the transcripts do not correctly reflect the content of the tape recordings, you should disregard them. In other words, the transcripts are used only as a matter of convenience.

There may be differences in meanings that may be caused by such factors as inflection in the speakers' voices or inaccuracies in the transcript and, therefore, you should rely on what you hear rather than what you read if there is a difference.

Disregard the transcript and listen to the tape if there is a difference.

We find nothing in the record to indicate that Simpson's lawyer objected to such oral instruction, or made any claim at any time during the trial that the giving of the oral instruction violated Rule 28.02(a), which requires that the trial court shall instruct the jury in writing on all questions of law arising in the case. The point relied on was not preserved for appellate review.

In his seventh point relied on, Simpson claims the trial court erred in denying his attorney's request to pass to the jury defendant's Exhibits C and E. Those exhibits were identified at trial as letters that Bolt, a 38 year-old man, had written to Stacey Simpson, a 14 year-old girl. Simpson claims the letters were relevant evidence since they affected Bolt's credibility as a witness, because these letters had sexual overtones.

■ We do not know what those exhibits contained, or if they were relevant, because they were never filed with this court. Rule 30.05 provides that in order for exhibits to be considered as part of the record, they shall be filed or deposited with the clerk of the appellate court on or before the day the case is set for hearing, or within 10 days of request by the clerk prior to the day of argument, whichever is earlier. The rule further provides that in cases where the attorneys orally argue the merits of the appeal, any exhibits not filed on or before the day of argument may be considered by the court as immaterial to the issues on appeal.

The exhibits in question were not filed with this court on or before June 20, 1989, which is the date on which this appeal was set for oral argument. If a party wishes us to consider the relevancy or the admissibility of a proffered exhibit, it is his duty to furnish the exhibit to us before the cause is submitted, so that we will have some factual basis for our determination. Since Simpson did not do so, his point of claimed error was not properly preserved.

■ In his final point, Simpson's attorney claims the trial court erred in submitting the case to the jury after a 12–hour trial, thus depriving Simpson of competent and efficient counsel, because his had become "physically and mentally exhausted." At the close of all the evidence, at approximately 6:00 p.m., the trial judge inquired of the jury as follows:

Now do any of you feel that you're too tired to hear the rest of it this afternoon

or would you rather come back tomorrow? Is there anybody who feels that they're too tired to hear the rest of it today?

(No response from the jury.)

THE COURT: I assume you would probably rather dispose of it today than come back tomorrow, would you not?

(No response from the jury.)

Upon returning from dinner before closing arguments took place, the following discussion was had:

MR. MAGEE: Court, please, I want to make a record. It's now approximately 8:17 p.m. I've been in this courthouse since 8:15 a.m. with something less than an hour at noon time and about an hour and forty-five minutes now, and going to the jury at this late hour. The defendant is entitled to competent and efficient counsel. I question that after twelve hours in the courthouse that I'm either one. I would suggest to the Court that this case be submitted to the jury in the morning after everyone is rested so that there would be no constraint on the jury as to time for deliberation as they too have been in this courthouse for twelve hours.

THE COURT: I don't think there's any pressure on them. As you will recall, earlier I asked them if they preferred to dispose of the case today and asked them if they were tired. None of them indicated that they were. So be overruled.

The jury retired to deliberate at 8:53 p.m. and returned with a verdict at 10:30 p.m.

A trial court has considerable discretion in determining when to grant a recess or temporary adjournment during a trial, and such discretion will not be disturbed absent a showing of an abuse of that discretion. *State v. Wilson,* 732 S.W.2d 186, 188 (Mo. App.1987). There has not been any such showing here. Simpson has not shown where the trial court's decision not to continue the trial until the next day prejudiced his defense in any way, or how his attorney's closing argument, which was the only thing he had left to do when the trial court refused his request to lay over the case until the next day, was affected in any way by the trial court's denial of his request. The trial court did not abuse its discretion by such denial.

Judgment of conviction affirmed.

HOLSTEIN, C.J., and CROW, P.J., concur.